Garsh, J.
This case involves the authority of the defendants, the Commissioners of the Massachusetts Highway Department (“MHD”), to issue certain bid specifications for work on the Central Artery/Third Harbor Tunnel Project (“Project”). The plaintiff, Utility Contractors Association of New England, Inc. (“UCANE”), seeks invalidation of a bid specification issued by MHD which includes a provision requiring all successful bidders, including contractors and subcontractors, to execute a project labor agreement as a condition of the bid award (“Project Labor Agreement”).
UCANE asserts that MHD lacks authority under Massachusetts law to require the Project Labor Agreement and attacks the bid specification on numerous statutory and constitutional grounds. The parties have filed cross motions for summary judgment. For the reasons set forth below, UCANE’s motion for summary judgment is DENIED, and MHD’s cross motion for summary judgment is ALLOWED. _
BACKGROUND
I. Procedural History
In June 1990, UCANE commenced this action seeking declaratory and injunctive relief against MHD to prevent it from issuing bid specification 7.40. That bid specification requires successful bidders for work on the Project to become signatories to a project labor agreement negotiated by Bechtel Corporation/Parsons Brinckerhoff Quade & Douglas, Inc. (“BPB”), the construction manager for the Project, with the Building and Construction Trades Council of the Metropolitan District and twenty-four individual affiliated local unions engaged in the building and construction trades in Eastern Massachusetts (collectively, the “Unions”). A project labor agreement is generally defined as a collective bargaining agreement negotiated by either the owner or its general contractor with unions to govern the terms and conditions of employment of workers employed on a particular project. On August 2, 1990, this court (Todd, J.) denied UCANE’s request for a preliminary injunction.
UCANE appealed the denial of its motion for a preliminary injunction. While the appeal was pending, the United States Court of Appeals for the First Circuit addressed federal issues involving a virtually identical bid specification issued by the Massachusetts Water Resources Authority (“MWRA”). That bid specification required contractors working on the Boston Harbor Cleanup Project to execute a project labor agreement negotiated by MWRA’s project manager. On October 24, 1990, the First Circuit held that the MWRA’s bid specification was preempted by the National Labor Relations Act and enjoined its use. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority, 935 F.2d 345, 360 (1st Cir. 1991).
In reaction to the decision of the First Circuit, MHD announced that it would not issue the disputed bid specification. The Appeals Court then dismissed as *18 moot UCANE’s appeal. Utility Contractors Association of New England, Inc. v. Department of Public Works, 29 Mass.App.Ct. 726, 729 (1991). On September 18, 1992, MHD made execution of the project labor agreement voluntary for contractors on the Project, pending United States Supreme Court review of the First Circuit’s decision.
The United States Supreme Court reversed the First Circuit’s decision on the MWRA bid specification, holding that the bid specification did not violate federal labor law. Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218, 233 (1993). MHD responded by re-issuing the bid specification requiring compliance with the Project Labor Agreement.
II. Undisputed Facts
The following material, undisputed facts are gleaned from the affidavits and other materials filed in connection with the cross motions for summary judgment:
The Central Artery/Third Harbor Tunnel Project is designed to increase capacity, reduce congestion, and improve traffic flow and safety. This multi-year, multi-billion dollar Project is one of the most ambitious and complicated construction projects ever undertaken in this country, and it is the largest public works project ever attempted in New England. The Project involves major improvements to, and expansion of, two interconnecting interstate highway systems, construction of a new eight-to-ten-lane underground expressway, and construction of a new four-lane tunnel under Boston Harbor connecting the Massachusetts Turnpike and the Logan Airport road system. Adding to its complexify is the fact that three-quarters of the construction on the Project will take place underground in densely populated, urban areas. Construction will also take place in or around already congested existing mass transit systems that cannot be taken out of service for any extended period of time during the construction.
The major features of the Project are (a) an intricate new highway interchange where Interstate 93 (the “Central Artery”) and Interstate 90 (the “Massachusetts Turnpike”) converge, (b) a 3.3 mile widened and depressed Central Artery running through downtown Boston to replace the existing elevated Central Artery highway structure, and (c) a 3.7 mile extension of the Massachusetts Turnpike from the Central Artery to Boston Harbor, including a new Third Harbor Tunnel to Logan International Airport (“Logan”) and a new highway interchange at Logan running north from the tunnel to Route 1A.
Traffic congestion in Greater Boston has reached unacceptable levels. Studies performed for MHD revealed that the traffic problem in Greater Boston was so severe that it threatened the region’s continued economic growth and ultimately would result in widespread traffic congestion for up to fourteen hours per day. Without the Project, the Central Artery, which now carries double the traffic volume for which it was designed, would have had to be reconstructed soon. The Project’s construction schedule recognizes the urgency of that situation. Successful completion of the Project will enhance the quality of life in the metropolitan area and is important to the continued vitality of Boston as a major center of commerce.
MHD currently estimates that the Project will take more than eight years to construct Project and that it will require the awarding of at least forty-five general construction contracts and the execution of an indeterminate number of subcontracts, assumed in excess of one hundred. MHD estimates the Project will require the employment of thousands of construction workers.
Based on the unprecedented complexity and scope of the Project, BPB’s plans include numerous measures designed to reduce disruption and public inconvenience. Despite these measures, the Project’s construction will have a discernible impact on existing transportation systems, traffic conditions, and vehicular and pedestrian access to areas in and around downtown Boston. Therefore, BPB developed a “fast track” schedule for the Project that involves construction of some portions of the Project while other portions are still under design. This approach will keep construction moving as fast as possible, thereby limiting the negative affect of construction on the community and the impact of inflation on costs.
The Third Harbor Tunnel opened for certain commercial vehicles on December 15, 1995. Based upon current estimates, the rest of the Project will not be completed before the year 2004.
UCANE is a non-profit corporation that represents union and non-union contractors, who are principally engaged in public construction for the Commonwealth of Massachusetts and other New England states, as well as materialmen, suppliers and associate members who assist those engaged in public construction in Massachusetts. Some UCANE members are pre-qualified to work on public construction projects for the Commonwealth of Massachusetts and MHD. UCANE members are presently performing contracts on the Central Artery/Third Harbor Tunnel Project and are currently bidding on the Project.
MHD is a body politic of the Commonwealth of Massachusetts whose duties and responsibilities are carried out by a Commission. The members of the Commission are appointed by the Governor. MHD’s responsibilities include pre-qualifying contractors who intend to bid on public works projects and advertising and awarding contracts for the construction of highways and related public works projects. On or about February 1984, MHD invited interested parties to submit Expressions of Interest and a Statement of Qualifications for the purpose of serving as the Prime *19 Construction Management Consultant (“PCMC”) on the first phase of the Project. The PCMC chosen for phase one would be given primary responsibility for managing, coordinating and reviewing basic Project design contracts. If the PCMC’s performance were deemed satisfactory during the first phase, MHD promised to negotiate the second phase with the same consultant. In the second phase, the PCMC’s duties expand to include the management, technical coordination, and responsibility for total Project review and evaluation of the proposed final design contracts for the Project.
BPB is a joint venture of Bechtel Corporation and Parsons Brinckerhoff, Quade & Douglas, Inc. Bechtel Corporation’s recent experience includes construction management responsibility on the Bay Area Rapid Transportation System (“BART”) in San Francisco, the Washington Metropolitan Area Transit Authority subway system in Washington, D.C., and the J.F.K. International Airport Expansion project in New York. Parsons Brinckerhoffs experience includes work on the Atlanta Subway System and the Seattle Bus Tunnel Project.
On December 3, 1985, following a competitive procurement process, MHD retained BPB to serve as the PCMC on the Project. Through a series of successive contracts, MHD has given BPB overall management responsibility for the planning, design, administration, and construction of the Project. Included within its construction management responsibilities is the duty to advise the MHD on labor relations issues and problems associated with the Project and to implement policies and decisions that are calculated to enhance the timely, efficient, and economical completion of the Project. The contracts between MHD and BPB provide that BPB, as the PCMC, shall act as the MHD’s representative and/or advisor at MHD’s request and subject to MHD’s general direction.
Union contractors are employers in the construction industry who recognize a craft or trade union as the exclusive bargaining representative of a majority of their employees in a particular trade or craft. Nonunion or merit shop contractors do not recognize craft or trade unions.
The inherent complexity of the likely labor situation caused MHD to have BPB analyze the labor environment of the Project and make a recommendation about how best to maintain labor harmony on the Project. BPB considered it essential to have uniform, efficient ways of handling jurisdictional assignments and jurisdictional disputes arising on the Project. On projects of this size and scope, it is common for different construction trades unions to claim exclusive jurisdiction over the same type of work. Disputes resulting from these conflicting claims can lead to work stoppages or other delays. BPB recommended to MHD that BPB negotiate a project labor agreement with the Building and Construction Trades Council of the Boston Metropolitan District and the Building and Construction Trades Department of the AFL-CIO (collectively, “the Union”). The Building and Construction Trades Council of the Boston Metropolitan District is a labor organization affiliated with the Building and Construction Trades Department of the AFL-CIO. Chief among MHD’s reasons for approving negotiation of a project labor agreement was the promise of an omnibus “no-strike” clause that would virtually eliminate the risk of delay due to labor disputes. Having procedures for resolving jurisdictional and other types of labor-management disputes was also important to MHD because they too minimize the potential for delay and disruption. In addition, MHD viewed the standardization of work rules and practices as extremely beneficial due to the flexibility gained by standardization and cost savings estimated by BPB.
In October and November of 1989, BPB negotiated with the Union. These negotiations closely followed the conclusion of negotiations between Kaiser Engineers, Inc. and the Union for a similar agreement on the Boston Harbor Cleanup project, and many of the provisions of these two agreements are identical, with different provisions negotiated where necessary to accommodate the special needs and requirements of each particular project. The proposed Project Labor Agreement was subject to approval by MHD. The Agreement states, in part, that it is the policy of MHD that all Project construction shall only be contracted to those contractors who agree to execute and be bound by the Project Labor Agreement. In a memorandum dated October 5, 1990, William Twomey, then Director of the Project, recommended that MHD’s Board of Commissioners incorporate the Project Labor Agreement into construction specifications for the Project. On October 10, 1990, MHD approved the Project Labor Agreement.
The Project Labor Agreement requires, among other things, that all Project contractors and subcontractors recognize the Union as the exclusive collective bargaining representative for their craft employees working on facilities within the scope of the Project Labor Agreement, utilize union hiring halls as the primary source of labor, and contribute to labor-management health and welfare funds and pension plans. The agreement also includes a comprehensive no-strike clause; it specifically covers jurisdictional disputes and includes a mechanism for resolving these disputes. The agreement contains a section on wages and benefits, and it establishes a standard work day and includes specific provisions on overtime, shifts, holidays, and reporting pay.
MHD Commissioners authorized promulgation of a bid specification requiring all successful responsible and eligible bidders and their subcontractors to execute the Project Labor Agreement as a condition of a Project contract award, and such a specification was issued. MHD was concerned about potential strikes *20 and resulting delays and the effect that conflicts among the various collective bargaining agreements could have on labor harmony. Added to this equation was the diversity, and resulting conflicts, that MHD believed could be expected from the differing practices of various non-union contractors on the Project.
In May, 1991, BPB, on behalf of the MHD, entered into an interim agreement with the Unions which suspended the disputed bid specification and allowed successful bidders to execute the Project Labor Agreement on a voluntary basis. Thereafter, MHD issued a revised bid specification. Then, in April of 1993, following the Supreme Court’s opinion in Building and Construction Trades Council of the Metropolitan District, 507 U.S. at 218, MHD re-issued bid specification 7.40 (the “Bid Specification”). It provides, as follows:
A collective bargaining agreement has been executed in conjunction with the CA/T project by and between Bechtel/Parsons Brinckerhoff (Management Consultant) and the Building and Construction Trades Council of the Metropolitan District and its affiliated local unions and the Building and Construction Trades Department, AFL-CIO and its affiliated international unions and their local unions. This labor agreement has been developed to promote labor harmony on the Project, and in the interests of such harmony, each successful bidder and any and all levels of subcontractors on condition of being awarded a contract or subcontract on or after March 24, 1993 agree to become signatory and be bound by the provisions of that collective bargaining agreement in the same manner as any other provisions of this contract. Notwithstanding the preceding sentence, no such contractor or subcontractor shall be required to sign or comply with, the collective bargaining agreement prior to May 24, 1993.
To date, fifty-five construction contracts worth $1,840,047,269 have been awarded on the Project. A total of two hundred ninety-six bids were received with respect to those fifty-five contracts, including thirteen bids by non-union contractors on ten of those contracts. With respect to only two of those thirteen bids, however, was the non-union contractor actually the low bidder (and one of those two withdrew its bid).[2] There are at least twenty-eight non-union subcontractors working on the Project. These subcontractors did not have to directly submit a bid for Project work because they , are subcontractors of a successful bidder, but they nonetheless had to agree to become bound by the terms of the Project Labor Agreement.
One of the most successful bidders on the Project has been Modern Continental Construction Co., Inc. (“Modern”), a unionized member of UCANE. Modern, either individually or in joint venture with another contractor, has bid on twenty-nine contracts and has been successful on nine of them. Modern is the largest recipient of work on the Project, with combined contracts valued at $446,906,849. At least fifteen other UCANE members have received Project work as either a prime contractor or subcontractor, including three who were successful bidders for Project work.
During the period from December 5, 1990 to May 24, 1993, when there was no mandatory Project Labor Agreement in effect, non-union and union contractors who did not voluntarily sign the Project Labor Agreement performed work on the Project without disruption by unions. Prior to this Project, MHD had never required a contractor to execute a project labor agreement as a condition of the award of a public works contract.
DISCUSSION
Summary judgment shall be granted when there are no genuine issues of material fact and the moving parly is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved," summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, 390 Mass. at 422.
That pre-hire project labor agreements on state public construction projects are permissible under federal law is settled. Building and Construction Trades Council of the Metropolitan District, 507 U.S. at 233. Federal law does not prohibit a state authority, such as MHD, acting in its proprietary capacity, from issuing bid specifications that require pre-hire project labor agreements providing for, among other things, union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls. Id. at 230.
The United States Supreme Court addressed the validity of project labor agreements on public works projects under federal law only. This case represents the extension of that inquiry under the laws of Massachusetts. UCANE claims that MHD’s actions were unlawful under a host of state statutory and constitutional provisions. UCANE does not, however, contend that, if MHD acted within the scope of properly delegated authority, its decision to require the Project Labor Agreement was arbitrary, capricious, or in bad faith.
I. Usurpation of Legislative Power
UCANE alleges that MHD lacks statutory authority to require bidders to sign a project labor agreement. UCANE claims that, because there was no such authority, MHD, by promulgating the Bid Specification requiring adherence to the Project Labor Agreement, unconstitutionally usurped the legislative law-making *21 function in violation of Article 30 of the Declaration of Rights of the Massachusetts Constitution.[3]
MHD derives its power to require the Project Labor Agreement from G.L.c. 16, §5(a) and G.L.c. 30, §39 M. Chapter 16, §5(a) is a general grant of authority to MHD “to approve all contracts, including specifications, made by the department, and any changes, alterations, amendments, or modifications thereof.” The competitive bidding laws, with which MHD must comply, require awarding authorities, such as MHD, to award contracts to the “lowest responsible and eligible bidder . . .” G.L.c. 30, §39M. The phrase “lowest responsible and eligible bidder,” in turn, incorporates the requirement that the bidder be “able to furnish labor that can work in harmony with all other elements of labor employed or to be employed in the work.” G.L.c. 30, §39M(c).[4] Additionally, the statute provides that “the awarding authority may reject any and all bids if it is in the public interest to do so.” G.L.c. 30, §39M(a).
The legislature thus has clearly expressed labor harmony and the public interest as a goal and objective for public works projects. The legislature also has granted the awarding authority power and discretion, taking the public interest into account, to determine bid specifications and to reject bids. Cf. Modern Continental Construction Co., Inc. v. Massachusetts Port Authority, 369 Mass. 825, 829 (1976) (agency’s decision, based upon consideration of “labor harmony,” not to award contract will not be overturned absent evidence of bad faith or arbitrary, capricious, or illegal action).[5]
Powers granted by a legislature need not be expressly stated. Rather, they “include those necessarily or reasonably implied.” Grocery Manufacturers of America, Inc. v. Department of Public Health, 379 Mass. 70, 75 (1979); Commonwealth v. Cerveny, 373 Mass. 345, 354 (1977) (“An agency’s powers are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words”).[6] Although the governing statutory provisions do not use the term “project labor agreement,” the necessary and inevitable implication of those provisions is that MHD has discretion to effectuate public interest and labor harmony through issuance of bid specifications requiring a project labor agreement. Cf. Massachusetts Hospital Ass’n, Inc. v. Department of Medical Security, 412 Mass. 340, 342 (1992). Indeed, there are a plethora of requirements imposed on public construction projects which do not have explicit statutory authorization, but that are within the purview of a contracting authoriiy’s general powers.[7] See generally Gil-Bern Construction Corp. v. Brockton, 353 Mass. 503, 504-05 (1968) (bidders required to submit network analysis of construction progress schedule with proposal); Builders Realty Corp. of Massachusetts v. Newton, 348 Mass. 65, 67 (1964) (no reason awarding authority could not require that a duplicate of bid be filed with city comptroller); Peabody Construction. Co., Inc. v. Boston, 28 Mass.App.Ct. 100, 104 (1989) (set-aside requirement for qualified minority and women business enterprises). Non-statutory bid requirements are within the discretion of the awarding authority to impose and to enforce. Id. See also Gil-Bern Construction Corp., 353 Mass. at 505 (“Minor or formal deviations from [bid specification] requirements do not compel rejection of the bid . . . although the bid may be rejected if the awarding authority so chooses”).
The Bid Specification, reasonably related as it is to the statutory purposes, was within MHD’s discretion to issue. The legislature has chosen not to micro-manage bid specifications. Nothing in the statutory scheme suggests that the legislature reserved to itself the right to determine, on a project by project basis, the desirability of a project labor agreement. Consequently, by issuing the Bid Specification, MHD did not usurp legislative prerogative in violation of Article 30 of the Massachusetts Declaration of Rights.
II. Delegation of Power
If MHD did not usurp legislative power, then, according to UCANE, the legislature improperly delegated power to MHD. Although the legislature may not delegate its general power to make laws, Opinion of the Justices, 393 Mass. 1209, 1219 (1984), it may adopt a policy and “delegate to a board or officer the working out of the details of that policy.” Massachusetts Bay Transportation Authority v. Boston Safe Deposit & Trust Co., 348 Mass. 538, 544 (1965) (citations omitted) (constitutionally adequate statutory guidance to public authority for its decision in the making of contracts of assistance).
Whether a particular delegation of legislative power is proper is a matter of degree. Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162, 171 (1989). In order to make that determination, the following three-part analysis is applied: “(1) Did the legislature delegate the making of fundamental policy decisions, rather than just the implementation of legislatively determined policy; (2) does the act provide adequate direction for implementation, either in the form of statutory standards or, if the [MHD] is to develop the standards, sufficient guidance to enable [it] to do so; and (3) does the act provide safeguards such that abuses of discretion can be controlled?” Id., quoting Chelmsford Trailer Park, Inc. v. Chelmsford, 393 Mass. 186, 190 (1984).
Policy
The competitive bidding laws explicitly pronounce the fundamental legislative policy decision that “public interest” and “labor harmony” are essential to public construction projects and relevant to determining bidder eligibility. These are not hollow directives. The legislature did not delegate to the awarding authority the power to determine policy; rather, it artic *22 ulated a policy and left it to the awarding authority to implement that policy.
Standards
Where “the policy and the purpose of the legislature are clearly expressed, the absence of detailed standards in the legislation itself will not necessarily render the legislation invalid as an unlawful delegation of legislative authority.” Chelmsford Trailer Park, Inc., 393 Mass. at 190. In deriving standards an agency may look both to the statute’s express provisions as well as to its reasonable implications. “The purpose, to a substantial degree, sets the standards. A detailed specification of standards is not required.” Id., quoting Massachusetts Bay Transportation Authority, 348 Mass. at 544.
Even though there are no explicit statutory standards with respect to project labor agreements, the legislative policy articulated in Sections 39M(a) and 39M(c) of the competitive bidding laws furnishes in itself a large measure of guidance. It has already been established that, in securing labor for a project, the awarding authority may take into account the labor harmony policy.[8] Modern Continental Construction Co., Inc., 369 Mass. at 828 (labor harmony is an appropriate factor in determining whether to accept bid). The standards implicit in the competitive bidding law policy of “public interest” and “labor harmony” are sufficient to ensure that MHD would not be permitted to act, under the guise of labor harmony, to accomplish something that was not, in fact, rationally related to promotion of labor harmony. Faced with the “public interest” and “labor harmony” provisions, a court can determine whether the MHD has been arbitrary or capricious or whether it has acted in bad faith. See Chelmsford, 393 Mass. at 190.
A project labor agreement may not be appropriate for every public works project, and MHD does not contend that it may require one capriciously without taking into account the size, complexity, timing, or anticipated duration of the particular project. “It would have been difficult, if not impossible,” for the legislature to have specified in the bidding statutes under what precise circumstances such an agreement may be required. Burnham v. Board of Appeal of Gloucester, 333 Mass. 114, 118 (1955) (standards adequate where only express requirement was to consider “the effects upon the neighborhood and City at large”).[9] The principles for guiding the awarding authority have been stated “with as much certainty as the nature of the subject matter reasonably permits.” Building Comm’r of Medford v. C. & H. Co., 319 Mass. 273, 281-82 (1946) (citations omitted). In determining whether a bidder is qualified, an awarding authority may consider the credibility of threats to labor harmony as well as the consequences of delay. Modern Continental Construction Co., Inc., 369 Mass. at 828-29. The greater the scope of a public works project in size and complexity, the greater the need for correspondingly tighter measures to ensure labor harmony, such as standardized working terms and conditions. As the record establishes, the Project involves thousands of manual employees in two dozen trades working side by side, and as many as ninety-six separate local labor agreements among the various building and trades unions in the Boston area will expire and be due for renewal and renegotiation over the life of the Project. The potential for labor strife is significant. Moreover, due to the interdependencies and integration of different work elements, a delay on even a small section of the construction could have a costly domino effect. Not even UCANE contends that MHD’s decision to require, on this Project, a project labor agreement that supersedes and reconciles conflicting provisions of local contracts was irrational, arbitrary, or capricious.[10]
Safeguards
Procedures for judicial review are necessary to guarantee that MHD acted in accordance with the standards and policy adopted by the legislature. Risk Management Foundation of the Harvard Medical Institutions, Inc. v. Commissioner of Insurance, 407 Mass. 498, 506 (1990). Bidders and potential bidders are so protected.
UCANE complains that the Project Labor Agreement forecloses the right of contractors to avail themselves of judicial review because it requires compulsory arbitration of disputes. Nothing in the Project Labor Agreement, however, foreclose UCANE from judicial review of whether MHD’s decision to require a project labor agreement as part of the bid specifications is beyond the authority of the MHD, or whether, in the circumstances of a particular project, requiring a project labor agreement would be arbitrary or capricious. Bidders have standing to challenge in court the compliance of an awarding authority with the requirements of the bidding statutes. Modern Continental Construction Co., Inc. v. Lowell, 391 Mass. 829, 835-36 (1984). Additionally, under the provisions of G.L.c. 149, §44H, the Commissioner of the Department of Labor and Industries has the power to investigate the facts to determine if there has been a violation of G.L.c. 149, §§44A through 44H, or of G.L.c. 30, §39M and, if a violation is found, to institute and prosecute proceedings in the Superior Court to restrain an award of a contract. Doric Building Associates v. Department of Labor and Industries, 27 Mass.App.Ct. 1175, 1177 (1989). These adjudicative and administrative review processes provide the requisite safeguards to ensure that the MHD does not abuse its discretion.
Accordingly, the bidding statutes do not impermis-sibly delegate legislative power to an awarding authority-
ill. Delegation to Private Party
UCANE alleges next that MHD unlawfully delegated legislative authority to BPB by authorizing BPB to *23 negotiate the Project Labor Agreement on its behalf. Although BPB played a major role in negotiating the Project Labor Agreement, MHD did not transfer its authority to BPB. MHD retained final authority to approve the Project Labor Agreement and to implement it through the bid specification process. It was MHD, not BPB, that issued the Bid Specification.
Corning Glass Works v. Ann & Hope, Inc. of Danvers, 363 Mass. 409, 424 (1973), upon which UCANE relies, does not require a contrary result. Central to the decision in Corning Glass Works that a price fixing statute improperly delegated legislative power to private parties were the facts that no public official participated in the price-setting process, nor was there any policy or standard to govern the setting of prices by manufacturers, nor opportunity for judicial review of the prices fixed by the manufacturer. Id. at 423. MHD, by contrast, retained sole authority to approve the Project Labor Agreement. Moreover, MHD, not a private party, issued the Bid Specification. There is nothing improper with MHD exercising its power to set bid specifications by reference to the Project Labor Agreement negotiated by BPB. See Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. at 172-73 (no improper delegation to private parties where substantive measures were established by reference to private bargaining agreement). Furthermore, there are proper safeguards to prevent the arbitrary exercise of any delegated authority. Id.
Thus, MHD did not improperly delegate its power to BPD.
IV. Chapter 150E
General Laws chapter 150E controls collective bargaining between a public employer and public employees. UCANE contends that this statute restricts MHD from negotiating or authorizing negotiation of a collective bargaining agreement. Because the workers on this Project are private, not public, employees, however, chapter 150E is inapplicable.
Chapter 150E is a statute of limited applicability, the scope of which is controlled by the definitions contained in the statute itself. Massachusetts Probation Ass’n v. Commissioner of Administration, 370 Mass. 651, 658 (1976). “Public employee” is defined to include only those employees who are employed by a “public employer.”[11] Chapter 150E does not apply to private companies or to workers employed in the private sector.
Whether or not BPB was acting as an agent of the MHD in negotiating the Project Labor Agreement is, therefore, not material.[12] The workers on the Project, who are the subject of the Project Labor Agreement, are employed by private companies, not by the MHD. UCANE does not dispute that Project workers will be employed by private contractors, not by MHD, and that workers will not receive government paychecks, will not be enrolled in the Commonwealth’s retirement system, and will not be subject to the labor contracts between MHD and its own employees. Indeed, UCANE concedes that Project workers are employed by private contractors, repeatedly referring to the workers as “private sector employees.” The Project Labor Agreement does not transform BPB into a “public employer.” While MHD obviously, under certain conditions, is a “public employer,” it did not function as a “public employer” in connection with the Project Labor Agreement. In that capacity, it acted like a private buyer of services, conditioning its purchasing upon the “sellers” agreeing to a project labor agreement. See Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority, 935 F.2d at 355, n. 17 (“[T]he relationship between the construction workers and the MWRA. is a contracting, not an employment, relationship”), reversed on other grounds sub nom. Building and Construction Trades Council of the Metropolitan District, 507 U.S. at 231 (“the State, in any event, is acting not as an employer but as a purchaser” when it issues a bid specification requiring a project labor agreement). Chapter 150E does not govern a collective bargaining agreement that, by its express terms, does not apply to employees of MHD itself.
V. The Prevailing Wage Rate Law
The Prevailing Wage Rate Law, G.L.c. 149, §§26-44, establishes minimum wage and benefit levels to be paid on state construction projects. UCANE complains that the Project Labor Agreement violates that law in several ways.
First, UCANE argues that MHD has usurped the function of the Commissioner of Labor and Industries to determine wages on public works projects. Where wage rates have been established by local collective bargaining agreements in the private construction industry between organized labor and employers, the Commissioner of Labor and Industries sets the prevailing rates based on those rates.[13] See Construction Industries of Massachusetts, 406 Mass. at 173. Contrary to the plaintiffs claims, this statutory scheme supports the use of a Project Labor Agreement, such as the one required in this case. The Project Labor Agreement does not intrude on the Commissioner’s domain; rather, it is just the type of agreement the statute envisions the Commissioner will use to set wage rates. Id. The Project Labor Agreement incorporates the same wages that would otherwise be set by the Commissioner.
Next, UCANE argues that the Project Labor Agreement creates an illegal union preference by requiring successful bidders to use union hiring halls as the primary source of labor. The Prevailing Wage Rate Law creates preferences only in favor of citizens of the Commonwealth, United States citizens, and veterans for work on public works projects. G.L.c. 149, §26. Requiring the utilization of union hiring halls does not *24 create a union preference. Unions have an obligation under federal law to make employee referrals without regard to a worker’s union status. Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. National Labor Relations Board, 365 U.S. 667, 675-76 (1961) (union hiring hall provisions not unlawful under federal law unless they in fact result in discriminations against non-union workers). UCANE has made no allegations that any workers were denied referrals because they were not unionized. Moreover, article III, Section 3 of the Project Labor Agreement prevents the union hiring hall referral system from discriminating against nonunion workers:
Such job referral system must be operated in a non-discriminatory manner and in full compliance with federal, state and local laws and regulations which require equal employment opportunities and non-discrimination, and referrals shall not be affected in anyway by the rules, regulations, by-laws, constitutional provisions or any other aspects or obligations of union membership, policies or requirements . . .
If a union hiring hall is unable to supply qualified labor within foriy-eight hours, the contractor may secure labor from any source, and the contractor retains the right to determine the competency of the referred labor and to “reject any applicant referred by the local union ...” The Agreement is further supplemented by an employment review board to handle any discrimination claims that might arise out of the operation of the union hiring halls. The Project Labor Agreement not only remains neutral with respect to hiring union or non-union workers, but it also takes affirmative steps to ensure that labor referrals are made on a non-dis-criminatoiy basis.
Finally, UCANE contends that the Project Labor Agreement upsets the statutory arrangement for nonunion workers to receive cash equivalents in lieu of participation in union health and pension plans.[14] G.L.c. 149, §27. UCANE lacks standing to assert this claim. “To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury.” Slama v. Attorney General, 384 Mass. 620, 624 (1981). UCANE or its individual members must be able to demonstrate that they have (or will) suffer a legally cognizable injury by virtue of G.L.c. 149, § 17. Animal Legal Defense Fund, Inc., v. Fisheries and Wildlife Board, 416 Mass. 635, 638 (1993). UCANE is not an impacted employee or an association of employees; rather, it is an association of contractors, and neither it nor any of its members has suffered any cognizable injury under G.L.c. 149, §17. See Animal Legal Defense Fund, Inc., 416 Mass. at 638. Furthermore, it is “neither difficult nor impossible” for an allegedly aggrieved worker to assert a claim. Slama, 384 Mass. at 624.
For all these reasons, the Bid Specification does not violate the Prevailing Wage Rate Law.
VI. Fair Competitive Bid Law
UCANE also alleges violations of the bidding laws on the grounds that the Project Labor Agreement is a “union-only requirement.” G.L.c. 30, §39M would bar the automatic exclusion of any bidder on the sole ground that the bidder employs non-union workers. Modern Continental Construction Co., Inc., 369 Mass. at 829. While UCANE is correct that “unionism” may not be a pre-requisite to eligibility, its factual premise is wrong.
As noted above, the Project Labor Agreement does not create a preference in favor of unionized workers. Indeed, the Agreement expressly forbids discrimination in the union hall referral process on the basis of union affiliation or lack thereof. “So long as bidders have the opportunity to bid in the same way, on the same information, and to bear the same risk of rejection, fairness and equality are preserved.” Department of Labor and Industries v. Boston Water and Sewer Comm’n, 18 Mass.App.Ct. 621, 626 (1984). The Project Labor Agreement applies equally to union and nonunion contractors; both may bid on the Project on the same terms. No contractor is favored under the Project Labor Agreement, although a non-union contractor is required to be bound by the same terms and conditions under which a union contractor already operates. See Department of Labor and Industries, 18 Mass.App.Ct. at 626 (“equal footing” principle should not be confused with certain advantages that a bidder may possess in meeting the bid specifications on the Project). Neither is there a requirement that any contractor become unionized to participate in the Project. Contractors are required to sign the Project Labor Agreement to work on the Project, but the Project Labor Agreement has no application or force outside of this Project, and non-union contractors are free to operate on their own terms on any other jobs.
UCANE has offered no evidence to suggest that the Project Labor Agreement has barred a single contractor from submitting a bid. Both unionized and nonunion contractors have bid on and received work on the Project.[15] One of the goals in the negotiations leading to the Project Labor Agreement was to ensure that non-union companies would have the right to bid on and obtain work on the Project. That one or more non-union contractors may have elected not to submit a bid does not establish that the Project Labor Agreement excludes them from the bidding process. See Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Resources Authority, No. 90-10576 (D. Mass. Apr. 11, 1990), 1990 U.S. Dist. Lexis 9839, at *14-15 (substantially identical MWRA project labor agreement held not to violate the public bidding statutes of Massachusetts); State ex rel. Associated Builders and Contractors Central Ohio Chapter v. Jefferson County Board of *25 Commissioners, No. 94-J-49 (Ohio Ct. App. Aug. 31, 1995), 1995 Ohio App. Lexis 3899 (project labor agreement that does not require any contractor to become a “union” employer, that does not distinguish between entities employing union labor and those employing non-union labor, and that applies only to work on the project does not violate state’s competitive bidding statutes), app. dismissed, 74 Ohio St. 3d 1499, 659 N.E. 2d 314 (1996); New York State Chapter Inc. Associated General Contractors of America v. New York State Thruway Authority, 620 N.Y.S.2d 855, 857 (App.Div. 1994) (in absence of evidence that project labor agreement requirement precludes nonunion contractors from bidding on proj ect, and where it was imposed for reasons which are in the public interest, requiring such an agreement does not violate state’s competitive bidding statute), leave to appeal granted, 631 N.Y.S. 2d 607 (1995).[16] But see Tormee Construction, Inc. v. Mercer County Improvement Authority, 143 N.J. 143, 669 A.2d 1369, No. A-55-95, slip. op. at 7 (N.J. Sup. Ct. Feb. 6, 1996) (specifications that required contractors to enter into a project labor agreement inconsistent with public bidding statutes where project labor was restricted to two unions).[17]
If bidders find the conditions of the Project Labor Agreement unacceptable, they may choose not to bid on the Project and instead seize other opportunities created by the lack of available contractors due to the Central Artery Project. See Building and Construction Trades Council of the Metropolitan District, 507 U.S. at 231 (“Confronted with [a required project labor agreement], those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement.”).
The Project Labor Agreement does not depart from the statutory scheme. Bids are still awarded without regard to the bidder’s union status. “Statutory bidding procedures are designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally.” Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 691-92 (1982). The Supreme Judicial Court has already determined that labor harmony is an appropriate factor for an awarding authority to consider in determining whether it is the public interest to reject bids. Modern Continental Construction Co., 369 Mass. at 829. In that case, the awarding authority on a public construction project voted to reject the lowest bid because it had received a letter from a local union threatening to picket if that bidder were selected for the project. Id. at 826. Addressing the competitive bid laws, the court found the rejection properly within the Authority’s power and affirmed the trial court’s ruling that “the requirement that a bidder be able to work ‘in harmony’ is ‘not satisfied merely by a bidder’s unilateral declaration that he can do so.’ ” Id. at 829. In awarding contracts, a public entity may determine for itself the “credibility of the threat [to labor harmony] and the consequences that would flow from its execution.” Id. Like Modern Continental, this case does not present a situation in which, in the name of labor harmony, a public authority has limited bidding solely to unionized firms. Id. The mere fact that MHD considered labor harmony as a factor in determining whether it was in the public interest to reject a category of bids — those unwilling to agree to the Project Labor Agreement — as opposed to whether it was in the public interest to reject a particular bid is not a critical distinction.
In sum, the public bidding statutes do not prohibit any bid specification for a public construction project that requires successful bidders to execute a project labor agreement.
VII. Bidder Pre-qualification
UCANE lacks standing to challenge the Bid Specification on the grounds that the Project Labor Agreement violates the pre-qualification provisions of G.L.c. 29, §8B and G.L.c. 149, §44D. A bidder has standing to challenge the compliance of the awarding authority with the requirements of those sections. Modern Continental Construction Co., Inc., 391 Mass. at 836 n.9, Quincy Ornamental Iron Works, Inc., v. Findlen, 353 Mass. 85, 87 (1967)). UCANE is not a bidder on a contract for work on the Project, and it does not allege that it or any of its members has suffered an injury under this section. See Animal Legal Defense Fund, Inc., 416 Mass. at 638.
Even if UCANE were to have standing, its claim would fail. Under G.L.c. 30, §39M(c), bidders must become pre-qualified pursuant to G.L.c. 29, §8B, which requires anyone bidding on a MHD project to file a statement of qualifications that is then used to determine the class and amount of work the bidder is qualified to perform. G.L.c. 149, §44D sets forth a similar plan for pre-qualification of general bidders for construction work on public buildings. These statutes merely address a contractor’s financial and operational ability to perform the work required. They do not excuse a bidder from meeting the published bid specifications. The pre-qualification requirement is but one of the elements of being deemed a “lowest responsible and eligible bidder” under G.L.c. 30, §39M(c). The Bid Specification does not offend, but stands in addition to, the pre-qualification provisions.
VIII. Filed Sub-Bid Law
The Bid Specification is also consistent with the Filed Sub-Bid Law, G.L.c. 149, §44F. Each sub-bidder is required to certify “that it is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed on the work.” G.L.c. 149, §44F(2). For the same reasons that MHD may *26 impose a Project Labor Agreement on all successful bidders in accord with the analogous labor harmony-provision in G.L.c. 30, §39M(c), it may do so with respect to sub-bidders.
Rudolph v. City Manager, 341 Mass. 31 (1960), relied on by UCANE, does not require a different result. The Court there stated that “the power of the awarding authority to require the rejection of a subbid, which is in all formal aspects satisfactory... may be exercised only for lack of competence of the rejected bidder.” Id. at 35. Where a sub-bid does not meet a project’s bid specifications, however, it cannot be deemed satisfactory “in all formal aspects."
IX. Due Process
UCANE challenges the constitutionality of the bid specification as violative of its members’ interest “in the enjoyment of their life, liberty and property, including the right to engage in a lawful occupation.” To invoke the protection of due process for “properly,” the alleged property interest “must rise to the level of an entitlement.” Opinion of the Justices, 401 Mass. 1211, 1229 (1987). A person “must have more than a unilateral expectation of it.” Take Five Vending, Ltd. v. Provincetown, 415 Mass. 741, 747 (1993), quoting Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).
The interest of a bidder does not amount to a constitutionally protected property interest; such a person does not have more than a “unilateral expectation” of receiving a public works contract. Associated Builders & Contractors, Inc. v. Seward, 965 F.2d 492, 299 (9th Cir. 1992) (“wishful bidders” have no constitutionally protected properly interest in public works project), cert. denied, 113 S. Ct. 1577 (1993); Smith & Wesson, Div. of Bangor Punta Corp. v. United States, 782 F.2d 1074, 1081 (1st Cir. 1986) (“[a]ward procedures are not designed to establish private entitlements to public contracts but to produce the best possible contracts for the government”).[18]
Even if there were a constitutionally protected properly right at stake, the Bid Specification would survive constitutional scrutiny. State action that does not implicate either fundamental rights or a suspect class is reviewed under the rational basis test, the lowest level of judicial scrutiny. Take Five Vending, Ltd. v. Provincetown, 415 Mass. at 748. The “right to . . . pursue one’s business” is not a fundamental right, Commonwealth v. Henry’s Drywall Co., 366 Mass. 539, 542 (1974), and no suspect class is involved here. See also Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436, 445 (1983).
The Bid Specification is rationally related to the promotion of general welfare, and the means chosen to effectuate MHD’s purpose is reasonable. Cf. Take Five Vending, Ltd. v. Provincetown, 415 Mass. at 748; Consolidated Cigar Corp. v. Department of Public Health, 372 Mass. 844, 855 (1977). There is no evidence that the Bid Specification, in light of the specific circumstances of this particular project, is arbitrary or irrational. The Project is one of unprecedented complexity and scope requiring the participation and coordination of thousands of construction workers employed by scores of different employers. “There is no reason to expect” the unique features of the construction industry, which have led to authorizing the use of project labor agreements, “to depend upon the public or private nature of the entity purchasing contacting services . . . There is no question but that [MHD] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost.” Building and Construction Trades Council of the Metropolitan District, 508 U.S. at 232. The Project Labor Agreement is a rational way to achieve that goal. Moreover, the Bid Specification operates equally upon all persons who wish to receive contracts to do work on the Project. The bidding process is equally open to union and non-union contractors and subcontractors. There is no arbitrary discrimination between different classes of citizens. Zayre Corp. v. Attorney General, 372 Mass. 423, 445 (1977). Under these circumstances, the Bid Specification easily passes the rational basis test. See Minnesota Chapter of Associated Builders and Contractors, Inc. v. St. Louis, 825 F.Supp. 238, 244 (D.Minn. 1993) (poor likelihood of success on merits of claim that requiring project labor agreement violates substantive due process).
X. Massachusetts Civil Rights Act
The Massachusetts Civil Rights Act protects against “any person or persons, whether or not acting under color of law [who] interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the Constitution or laws of the Commonwealth.” G.L.c. 12, §11H. UCANE contends that MHD violated this statute by coercing bidders into signing the Project Labor Agreement as a condition to receiving a contract for work on the Project.
This argument attempts to place under the protective umbrella of the Civil Rights Act the statutory and constitutional claims made by UCANE that this court already has rejected. Furthermore, the record gives rise to no inference that MHD engaged in threatening, intimidating, or coercive behavior within the meaning of the Civil Rights Act.
A “direct violation of a person’s rights does not by itself involve threats, intimidation, or coercion.” Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). See also Nicholas B. v. School Committee of Worcester, 412 Mass. 20, 24 (1992); Layne v. Superintendent, 406 Mass. 156, 158 (1989); Pheasant Ridge Associates Ltd. Partnership v. Burlington, 399 Mass. 771, 781, (1987). The Bid Specification simply involves direct action against the members of UCANE, which, *27 “by itself,” did not amount to a violation of the Civil Rights Act. UCANE does not allege “direct action that also includes threats against, or intimidation or coercion of, a particular individual or individuals.” Planned Parenthood League v. Blake, 417 Mass. 467, 473 (1994). Only under such circumstances can liability under the Civil Rights Act be established, and then only if such threats, intimidation, or coercion interfered with that individual’s exercise or enjoyment of rights secured by law. Id. However the words “threats, intimidation, or coercion” are defined, those words are not elastic enough to encompass including a non-statutory requirement in a bid specification for a public works contract. Id. at 474. Utility Contractors Association of New England Inc., 29 Mass.App.Ct. at 732 (MHD’s announced bid specification “does not in itself demonstrate threatening, intimidating, or coercive activity within the meaning of the MCRA”) (dictum). Compare Bally v. Northeastern University, 403 Mass. 713, 719-20 (no violation of the Civil Rights Act where student was excluded from intercollegiate sports for refusing to take urinalysis test without individualized threat or threat of serious harm) with Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95 (1987) (potential threats to the physical safety of the audience and symphony players). Thus, MHD did not violate the Civil Rights Act by issuing the Bid Specification.
XI. Administrative Procedures Act
UCANE’s final contention is that MHD has adopted a regulation without a public hearing in violation of the Administrative Procedures Act, G.L.c. 30A, §2. General Laws chapter 30A, §1 (5) defines a “regulation” as a “requirement of general application.”[19] Bid specifications generally are highly specific in application to a single project; although some specifications may be the same or repeated from project to project, MHD sets its specifications on each project separately, tailoring them to the needs of that project. The Bid Specification at issue is no different. It applies only to the Project and not to every proj ect in which MHD is the awarding authority. The Bid Specification is not a “regulation” for the purposes of G.L.c. 30A, §1(5). Construction Industries, 406 Mass. at 170 (wage rates on specific projects, rather than industrywide, not “regulations” under G.L.c. 30A, §1(5)); Associated Industries of Massachusetts v. Commissioner of Insurance, 356 Mass. 279, 284 (1969) (approval of rates does not constitute regulations of general application). Consequently, the requirements of the Administrative Procedures Act do not apply.[20]
CONCLUSION
MHD had the authority to issue the Bid Specification. It exercised its authority consistent with the laws and constitution of the Commonwealth.[21]
ORDER
For the reasons set forth above, the plaintiffs Motion for Summary Judgment is DENIED, and the defendant’s Motion for Summary Judgment is GRANTED.

Seventy-five per cent of Boston area construction is performed by unionized contractors. On other MHD road construction projects that have not been bid with a project labor agreement, unionized contractors have been the successful bidders for substantially all heavy highway work.

Article 30 of the Declaration of Rights provides:
In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.

G.L.c. 39M(c) provides, in part:
The term “lowest responsible and eligible bidder’ shall mean the bidder (1) whose bid is the lowest of those bidders possessing the skill, ability and integrity necessary for the faithful performance of the work; (2) who shall certify that he is able to furnish labor that can work in harmony with all other elements of labor employed or to be employed in the work. . .
See also G.L.c. 149, §44A(1).

UCANE does not argue that there is no reasonable relation between the Project Labor Agreement and the purpose of labor harmony, or that the Project Labor Agreement is not conducive to labor harmony. Indeed, the record is replete with evidence that the Project Labor Agreement effectuates labor harmony and acts to promote the timely, efficient, and economical completion of the Project.

To be sustained, agency action must be reasonably related to the purposes of the enabling legislation. Worcester Sand & Gravel Co. v. Board of Fire Prevention Regulations, 400 Mass 464, 466 (1987).

According to MHD, the specifications required for the hundreds of contracts already awarded on the Central Artery Project run into the tens of thousands of pages.

In determining bidder eligibility, a public awarding authority, such as MHD, may properly take into account specifications not required by the bidding statutes. E.g., Peabody Construction Co., Inc. v. Boston, 28 Mass.App.Ct. 100, 104 (1989) (awarding authority has discretion to accept or reject bidder based on compliance with non-statutory bid specification set by awarding authority); Builders Realty Corp. of Mass. v. Newton, 348 Mass. 64, 67 (1964) (awarding authority may reject lowest responsible bid that does not conform to awarding authority’s specifications).

See generally Capuano, Inc. v. School Building Committee, 330 Mass. 494, 496 (1953) (determination of who is lowest responsible and eligible bidder delegated to building committee and, in the absence of illegal or arbitrary action, that decision cannot be controverted); Slocum v. Medford, 302 Mass. 251, 254 (1939) (duty of the awarding authority to exercise, in good faith, “deliberative judgment as to which bidder would best serve the public interest”); Stretch v. Timilty, 309 Mass. 267, 270-271 (1941) (“choice as to the means to be employed to correct unfortunate conditions in the [police] department involves the exercise of discretion ... committed by statute to the police commissioner”); Liggett Drug Co., Inc. v. License Commissioners, 296 Mass. 41, 50 *28 (1936) (specification of “public good” as standard for measuring number of licenses is adequate).

During one hearing, in response to the court’s confirming that UCANE is not claiming that it was arbitrary, on the facts of this case, for MHD to have decided to require a project labor agreement, counsel for UCANE responded: “absolutely not.”

 G.L.c. 150E, §1 defines “public employer” as:
the Commonwealth acting through the commissioner of administration, or any county, city, town, district, or other political subdivision acting through its chief executive officer, and any individual who is designated to represent one of these employers and act in its interest in dealing with public employees . . .

The Contract for State Highway Work between MHD and BPB states that “the Management Consultant shall be deemed to be acting as the Department’s agent in its dealings with third parties in connection with this Agreement,” and that ”[t]he Management Consultant shall act as the Department’s representative and/or advisor at its request and subject to its general direction in accordance with this agreement.” However, it also provides that “the Management Consultant shall have no real or implied authority to bind the Department in contract or by declaration or admission ...” The title page of the Project Labor Agreement states that it is “By and Between Bechtel/Parsons Brinckerhoff on behalf of the Massachusetts Department of Public Works.” On the other hand, Article II, Section 4 of that Agreement states that it “shall only be binding on the signatory parties hereto and shall not apply to the parents, affiliates, subsidiaries, or other ventures of any such party.” MHD is not a signatory. Moreover, Article II, Section 7 of the Project Labor Agreement specifies that “(n)one of the provisions of the Agreement shall apply to the Massachusetts Department of Public Works.”

G.L.c. 149, §26 provides:
The rate per hour of the wages paid to . . . laborers in the construction of public works shall not be less than the rate or rates of wages to be determined by the commissioner as herein provided: provided . . . that if, in any of the towns where the works are to be constructed, a wage rate or wage rates have been established in certain trades and occupations by collective agreements or understandings in the private construction industry between organized labor and employees, the rate or rates to be paid on said works shall not be less than the rates so established . . .

Employers’ payments to health and welfare plans, pension plans, and other supplemental benefits under collective bargaining agreements are included in the prevailing rate established by the Commissioner of Labor and Industries. G.L.c. 149, §26. The Project Labor Agreement does not change this statutory arrangement. Under the Prevailing Wage Rate law, an employee is entitled to an equivalent payment only when his employer does not make payments to health and welfare plans, pension plans, and other supplemental benefits. G.L.c. 149, §27. Under the Project Labor Agreement employers agree to make payments to such supplemental benefit plans.

As of September, 1995, 55 construction contracts have been let on the Project. A total of 296 bids were received with respect to those contracts, including 13 bids by non-union contractors on 10 of those contracts. Of those 13 non-union bids, only 2 were low bidders, and one of those was withdrawn. There are at least 28 non-union subcontractors working on the Project under the terms of the Project Labor Agreement. Unionized contractors perform 75% of the large construction work in the Boston area, and on other road construction projects that have been bid without a project labor agreement, unionized contractors have been the successful low bidders for substantially all heavy highway work. As contract size increases, so does the likelihood that the successful bidder will be a unionized contractor. The nature and size of the contracts to be awarded makes it likely that the vast majority of Project construction will be performed by unionized contractors, with or without a project labor agreement.

See also General Building Contractors v. Dormitory Authority, 620 N.Y.S.2d 859, 860 (App.Div. 1994), leave to appeal granted, 631 N.Y.S. 2d 607 (1995); Rondout Electric Inc. v. County of Orange, No. 5975/95 (N.Y. Sup. Ct. Dec. 22, 1995).

The Court did not find that the bidding statues prohibited any type of project labor agreement no matter how complex the project. Indeed, it observed that a projects such as the Tappan Zee Bridge “exemplifies the exceptional circumstances that could justify recourse to a PLA.” Tormee Construction, Inc., supra, slip op. at 8-9.

Three Rivers Cablevision, Inc. v. Pittsburgh, 502 F. Supp. 1118, 1131 (W.D.Pa. 1980), by contrast, recognizes “a property interest of relatively narrow dimension . . . that interest [is] the right of the lowest responsible bidder in full compliance with the specifications to be awarded the contract once the [awarding authority] in fact decided to make an award.” (emphasis supplied). UCANE asserts a right on behalf of bidders who do not want to comply with the specifications.

G.L.c. 30A, §1(5) in its entirety reads:
’Regulation’ includes the whole or any part of every rule, regulation, standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement or inteipret the enforce or administered by it, but does not include (a) advisory rulings issued under Section eight; or (b) regulations concerning only the internal management or discipline of the adopting agency or any other agency, and not substantially affecting the rights of or the procedures available to the public or that portion of the public affected by the agency’s activities; or (d) regulations relating to the use of public works, including streets and highways, when the substance of such regulation is indicated to the public by means of signs or signals; or (e) decisions issued in adjudicatory proceedings.

UCANE did receive notice of the proposed Project Labor Agreement and, prior to issuance of the Bid Specification, UCANE met with MHD to discuss its opposition to the Project Labor Agreement.

It is not necessary to rule upon the additional argument made by amicus curiae Building and Construction Trades Council of the Metropolitan District, AFL-CIO that a blanket state law prohibition upon the use of project labor agreements on public construction projects would be preempted by the National Labor Relations Act since this court rejects UCANE’s arguments that Massachusetts law contains such a per se prohibition. See Chamber of Commerce v. Reich, F.3d, No. 95-5242, slip. op. at 27-28 (D.C. Cir. Feb. 2, 1996).